Chief Justice Robertson
delivered the Opinion of the Court.
The only question presented for consideration in this case, is whether Milus W. Dickey, as the contractor for carrying the United States’ Mail from Maysville to Lexington, in this State, has the right, in execution of his engagement, to transport the mail in stage coaches on the turnpike road between those termini, without paying, to the use of the Turnpike Company, the rate of tollage exacted by it, under the authority of its charter, from other persons for the transit of their horses and carriages.
All national power should belong exclusively to the general or national government. And, as nothing can be more national than the regular and certain diffusion of intelligence among the people of the United States through the medium of the public mail, therefore, the power “to establish post offices and post roads” is expressly delegated by the federal constitution to the Congress of the United States; and that power being necessarily exclusive, plenary, and supreme, no State can constitutionally do, or authorize to be done, any act which may frustrate, counteract, or impair, the proper and effectual exercise of it by national authority. From these axiomatic truths it follows, as a plain corollary, that the general government has the unquestionable and uncontrollable right to transport the national mail whenever and wherever the National Congress, in the constitutional exercise of its delegated power over post offices and post roads, shall have prescribed. But full and exclusive and sovereign as this power must be admitted to be, it is not unlimited. It cannot appropriate private property to *114 public use without either the consent of the owner, or the payment of a just compensation for the property, or for the use of it. If the general government may constitutionally use a private way, or establish a post road through the lands, or a post office in the house, of a private person, any person whose property shall be thus taken or used for public benefit, may lawfully demand a just compensation for the property, or for the use of it; the federal constitution expressly secures it to him by interdicting the appropriation of private property to public use, without the owner’s consent, or just compensation.
So fur as the designation and use of any State road as a post route, may be concerned, the power to establish post roads cannot im port more than the precedent power to esta Impost offices, and transport the mails — excepting only,that theone implies only a right of use, upon just and common terms, as long only as a stale shall choose to continuearoad as a State road, and the other may imply a right in congress, not only to enjoy the like use, but to continue, as a post route, a road once adop ted or designated or established as a post road, even after it shall have been discontinued as a State road.
Unless Congress shall elect to exert its right of eminent domain, and buy a Slate road, or make one, or help to make or repair it, the constitution gives no authority to use it as a post road, without tito consent of the State, or owner, or without making a just compensation for the use. And, therefore— Even if the Lexington & Mays-ville turnpike should be deemed a public t'tate road in all respects, and if the mail contractor has a right to transport thorn on any public road he may pre fer or choose to adopt, between Lexington and Maysville,he can notdoso,norhad Congress power to authorize him to do so,without paying fortheuse if demanded, a just compensation, and that is —prima facie at least — what other persons are required to pay, for a similar use of it.
*114 Having been constructed by an association of individuals incorporated into a private body politic by an act of the Kentucky Legislature, which gave the corporation the right to charge tolls, according to a prescribed scale, in consideration of the appropriation of its own funds to the construction of the road for the public benefit — the turnpike road from Maymlle to Lexington should be deemed private property, so far as the value of the franchise and the right to preserve it, as conferx-ed by the charter in the nature of a contract, may be concerned. And therefoi’e, the public — whether it be Kentucky or the United States — can have no constitutional right to use the road without contributing, to its reparation and pi’eservation, either a just compensation for the use, or the rate of tollage pi-esci'ibed by the coi’poration under the sanction of its chartei-. By authorizing the company to exact a fixed compensation for the use of the road, the charter interfered with or impaired the power to carry the mail wherever Congi’ess should elect to carry it, no moi-e ‘nor otherwise than it obstructed or impaired the right of every freeman to ti’avel on any public way he might choose thus to use.
Had Congress designated this road as the mail route from Maysville to Lexington, the right to use it as such would have been subject to the condition of paying, either a just compensation, or the toll which every citizen is requii'ed to pay; for the road would still have been the property of the corporation, and the burthen of repairing it, when dilapidated by the horses and coaches *115 of the mail contraeter, would have devolved on the stockholders. There is no restriction, as to locality, on the federal power to establish post offices and post roads. But the right to use private property for a mail route, as for any other national purpose, being qualified by the constitutional condition, that a just compensation be made for the use, unless the owner shall voluntarily waive it, the power to establish post offices and post roads wherever Congress deem it expedient to establish them, though exclusive and supreme, does not, therefore, imply an authority to take or to use, for that purpose, the land or the house of a citizen, or the rail road or McAdamised road of associated citizens, without paying to the owner or owners a just compensation.
The turnpike road between Maysville and Lexington is the property of the stockholders, in the same sense in which the rail road between Lexington and Frankfort is the property of the Company whose money constructed it. The only difference is, that the rail road company is not required by its charter to permit any person to use its road otherwise than for transportation in its own vehicles, and the charter of the turnpike company requires it to permit all persons, who may desire to use its road for transportation or travel, to do so, in their own way — on foot, on their own horses, or with their own carraiges — by paying a prescribed toll. And can it be doubted that the United States would have no constitutional right to use, as a mail route, the rail road between Lexington and Frankfort, without the consent of its owners, or without paying them for the use a reasonable compensation? He who doubts on that subject, would be chargeable with palpable inconsistency, unless he should also doubt whether his own house might not be taken and used as a post office without his consent and without any compensation; for the power to establish post offices and the power to establish post roads are commensurable, and the one is as sovereign and unlimited as the other, and not, in any sense or in any degree, more so.
Can the carrier of the United States mail have a right, either legal or moral, to use the bridge of a private per *116 son, or of an incorporated company, without paying pontage, or the ferry of a grantee of such franchise without paying ferriage? That he would have no such right is, in our judgment, indisputable. And the denial of such an unjust and anomalous pretension is not at all inconsistent with the proper supremacy of the general government, in the. exercise of its necessary power to transport the mail as cheaply, speedily and certainly as possible, and when and where Congress shall have prescribed and had authority to prescribe. The power delegated to the general government over the mail cannot be greater than that which each State once possessed within its own borders; and had the people of the States never delegated any such power to Congress, the State of Kentucky, in all the plenitude of her power, upon that hypothesis, would surely have no right to use the Lexington and Maysville turnpike as a post road without paying a just equivalent to the company; for the' constitution of Kentucky, like that of the United States, provides that private property shall not be taken for public use without “just compensation” to the owner, or without his consent; and moreover, no State can, consistently with the federal constitution, pass any legislative act impairing the obligation of a contract; and not only is the turnpike- stock private property, but the charter of the company is a contract, entitling the stockholders, for a valuable consideration, to prescribed tolls, of which the Legislature could not deprive them without impairing the obligation of a solemn contract, and violating the plighted faith of Kentucky. There can, we think, be no doubt that the State had a perfect right to make such a contract, and, having made it, is certainly under a clear moral and political obligation to observe it scrupulously and in good faith.
But, if the Lexington and Maysville turnpike should be deemed in all respects a State road, and if the power to establish post roads should be understood as giving to Congress authority to designate and use, as a post road, any highway in a State,without the consent of the State, nevertheless, such a power could not be understood as implying a right to use State roads upon any terms, or *117 in any manner the general government may choose to prescribe, or on better terms than those on which the people of the States themselves are permitted to use them in a similar manner. It certainly does not impose on any State the duty, either moral or political, of making or of repairing roads for post roads, but leaves them in the full possession of all the discretion they would otherwise have had to make such State roads, and to keep them in such repair as their own convenience and judgment alone may suggest. The people of the several States are under no constitutional obligation to make or repair roads for the use of the general government; nor can they be required to apply their own labor or money even to the keeping open of any one of their roads which shall have been designated as a post route; for, though a State highway once legally designated or established as a post route may continue de jure a post road as long as the act of Congress by which it was so designated or established shall remain unrepealed, yet certainly the State will not therefore be bound to continue it, but may discontinue it as a Stale road; and consequently, if, after any such discontinuance of any such State road, the general government choose still to use it as a post road, Congress must keep it open and in suitable condition, by the application of national means. The people of a single State are not exclusively interested in the transportation of the national mails within and through their own Commonwealth; the people of all the States are benefitted by the proper and effectual transportation of intelligence through each State. And hence the interest being thus common, and the power therefore national, the burthen, and the responsibility also, should be, and undoubtedly are* equally national, in each and every State. The right to judge, and the responsibility of judging, as to what roa&s and kind of roads the United States shall have for post roads, having been devolved on Congress, a State can neither exercise any controlling authority in that respect, nor be held responsible for any deficiency in any of the facilities necessary or proper for the most effectual transportation of the mails.
A right of way, upon terms equal and common to all, *118 js? jn our opinion, the utmost privilege that can be implied by an authority to designate State roads as post routes.
If one State should, at great expense,- construct and preserve excellent roads, for the use of which it should exact a prescribed and reasonable toll sufficient for reparation, or even for indemnity for the cost, the people of other States, not choosing to provide such roads for themselves, would have no right to require or expect that the public mails, in which they are all interested as a national concern, should be transported, in carriages or otherwise, upon those costly and superior roads, without any contribution from the national purse for such national use, and for the wear and deterioration necessarily resulting from it.
If Congress, representing the interests and wills of the people of all the States, shall fail or refuse to make any appropriation for constructing or repairing, or for aiding the construction or reparation, of good roads in a State, the general government would, as it seems to us, have no pretence for claiming, for the federal public, any exclusive privileges in using such roads as post routes, or any exemption from the burthen common to every individual of the local public, whose labor and money alone made and must preserve them. It appears to us, that permission to the general government to use State roads as the Slate and its own citizens use them, and on the same terms, should be considered a boon rather than a burden ■ — a valuable privilege rather than an unjust or unauthorized exaction.
A State road is, we think, private property, as contra-distinguished from federal property, by the federal constitution. It belongs to the people of the State, Ivas made by them, must be repaired and preserved by iheir labor and money, and is subject exclusively to the4- jurisdiction and control. Then, according to the constitution of the United States, can the general government possess a paramount authority to use and dilapidate such a road, and thus impose on the people of the State an accumulated burthen without their consent, and without making any compensation for the appropriation of *119 their local propei'ty to international use? We can perceive no plausible ground for an affirmative answer.
But the learned counsel for Dickey has argued that, if the power be conceded to a State to tax the general government for transporting the mail on a State road, the right to designate and use State roads as post roads might be altogether frustrated by a perverse and captious State. Could the power to exact compensation or toll from the general government for using State roads as post roads, imply an illimitable right of exaction which might be so abused as to amount to a prohibition of the use, and had the power over post roads been given to Congress for the purpose of designating the mail routes, and for no other purpose than that of designation and use, we would acknowledge that the argument would be not less conclusive than, it may, on a superficial view of it, seem to be plausible.
But we do not admit, either that a federal power to designate and use State roads for post roads, and a State power to exact a just compensation or toll for the use, are necessarily conflicting powers; or that the Lexington and Maysville turnpike has ever been designated as a post road; or that the power to establish post roads was given merely for enabling Congress to designate and use State roads as mail routes, or that a denial of the right to use State roads without the consent of the State, or without just compensation, would destroy or essentially impair the national and comprehensive and supreme power “ to establish post roads.’’'’
The national power to use the land of a citizen or a State for an armory or fortification, is undoubted and irresistible. The constitutional obligation to pay the owner a just equivalent, if it be demanded, is equally undoubted and inevitable. Yet, nevertheless, there is no conflict of power or of right, and the supremacy of the general government is unquestioned and unimpaired. And the acknowledgment of a right in a State or a private corporation or a citizen to exact a toll from the general government, for the use of a road as a post road, does not imply that the right is unlimited. If the general government have no right to use a State road or *120 private- road without the consent of the State or owner, then the power to exact toll for using it would undoubtedly be illimitable; and nevertheless, if exercised so as to prevent the use, the general government would surely have no just cause to complain that any of it£ powers or rights had been denied. But, if the general government have a right, without the consent of a State, to use a State road as a post road, the fact that such a right exists, prescribes a clear and indisputable boundary to the power of taxing for the use; and that is “a just compensation” — the right to exact which cannot be inconsistent with the proper exercise of any power, or enjoyment of any right, which can be constitutionally claimed by the national government.
If, as in this case, the tax or toll be uniform and universal, the very fact that it is so, is the most satisfactory proof that it does not exceed a just compensation: first — ■ because it has been fixed by a public and general law operating on all alike; and, secondly — because it would be unreasonable to presume that a State, when fixing a general rate of toll age for the use of a road constructed and preserved only for public use, would ever attempt to exact a rate so exorbitant as to defeat the object of prescribing it: that is,profit, or indemnity, to the people of the State, to be secured only by the general use of it.— And there is no complaint that the toll exacted in this case exceeds a just compensation.
Moreover, as before suggested, we understand the power to use Stale roads as post roads, to be only a right of common way; that is, an authority to use such roads as the people themselves use, and on the same terms — neither better nor worse. And on this construction, there can be no semblance of plausibility in an argument founded on possible abuse of State power.
But, unless we are altogether mistaken, the Maysville and Lexington turnpike has never been even designated by Congress as a post road. The act of Congress directing the mail to be carried between Lexington and Maysville, designated no particular road or route; and it was, moreover, passed prior to the construction of the turnpike, which is far from being identical in locality *121 with the old road which it supplanted. If, then, any road from Maysville had ever been designated as a post road, it was the old and sometimes impassable road which has been discontinued since the completion of the new and far better road of the turnpike company. But in this, as in most other instances since the adoption of the federal constitution, Congress has not exercised its power “io establish post roadsbut has chosen to depend on the self-interest and comity of the government and people of Kentucky, and the discretion of the mail contractor, who may carry the mail on the turnpike, or not, just as he may prefer and be permitted.
If, then, Mr. Dickey be unwilling to pay what others have to pay for using the turnpike road, he may, without any violation of law, or breach of his contract, adopt some other and cheaper road, provided he shall carry the mail in the time required, and with safety. But if he will use a road never established as a post road, he certainly can have no right to claim any exclusive privileges, or to refuse to comply with the condition on which alone evéry other person is permitted to use the same road; and surely the general government — having neither contributed to the construction or reparation of the turnpike road, nor established it as a post road, nor claimed the right to use it without paying the prescribed toll, nor even stipulated for securing such use of it to the mail contractor — could have no pretence for complaining that the exaction of toll from the contract- or, is a defiance of its supremacy, or an impairment of any of its rights. But that government has not complained, nor will it, as we are bound to presume. The Postmaster General, as we presume, made the contract with Dickey, with the understanding by both parties, that if, as was doubtless expected, he should carry the mail on the turnpike, he would have to pay the customary toll, for which he expected to be indemnified by the facilities afforded by such a road, and by the price allowed to him by the contract; and there is, therefore, no pretence for insisting that the exaction of tolls conflicts with any power of the general government, or for withholding from the owners of the road that compensation *122 for which the contractor has been indemnified, either by his contract, or by the road itself.
But the simple power “to establish post offices,” necessarily including (as it does and has always been understood as doing) plenary authority to superintend the transportation of the national mails, would, itself and alone, give an implied right of way over State roads as they shall be found to be, and cum onere. The power to establish post offices was given by the articles of confederation to the confederate Congress. And, though that body was expressly interdicted from exercising any other power than such as had been expressly delegated, nevertheless it had, invariably and without question or complaint any where, superintended and regulated the transportation of the entire mails of the States, and used, for that purpose, the roads of the Statés as the people used them, and no other roads, nor on other or better terms.
But the confederate Congress had no power to make or repair post roads, or to use any other road than such as the States chose to keep open and to use.
The want of such comprehensive and elective power was, as we presume, felt to be injurious and sometimes subversive of the great end of giving to the organ of the national will exclusive control over the national mail: not because mail contractors had to use State roads just as other persons used them, but because some State roads were not altogether suitable ways for the transportation of the mail with proper celerity and certainty, and because sometimes there might be no road where the national interest might require one for the most effectual diffusion of intelligence through the mails, and because, also, a State might obstruct or derange the mails by the discontinuance of a road which had been used as a mail route; and therefore, when the federal constitution was adopted — and which was intended to give to a common government all national powers necessary for all national objects — the people gave to the national Congress the supplemental and important power to establish post roads, as well as post offices. As this new specific power was not necessary for giving authority to use State roads, it should not be understood as conferring any other right *123 in the designation and use of such roads as post roads, than that which existed before, and would still have continued to exist, without doubt, under the constitution, had it given no other power as to post roads than the pre-existent pow7er “Zo establish post offices,” which included necessarily the right to designate and use State roads as post roads. As to mere designation and use, the only difference is, that, as the power to establish a post road imports authority to fix permanently and retain, Congress may have power to keep open and use a road once designated as a post road, even though it shall be obstructed or discontinued by the State. If the power to establish post roads includes the power to designate and use State roads, the right of use, which it may imply, cannot — with the exception just stated — be essentially different from that implied by the power to establish post offices and carry the mails. And so far the two powers over post offices and post roads are identical but the latter is, in other important respects, more comprehensive and efficient than the former; for we are clearly of the opinion that both the objects contemplated by the grant of the new power to establish post roads, and the plain constructive import of the grant itself, as made in the constitution, show that this comprehensive and express power was given, not for authorizing the mere designation and use of State roads as post roads, but for enabling the general government to make, repair and keep open such roads in every State, as might, under any circumstances, be necessary for the most effectual and satisfactory fulfilment of the great national trust of transporting the national mails safely, certainly, speedily and punctually, without any necessary dependence on the policy, or will, or purse of any one of the States; and these were, in our opinion, the only ends for which that express power was given. And therefore, if Dickey should be considered as having from the general government a charte blanche, entitling him to all the privileges in the use of any road he may prefer between Lexington and Maysville, which Congress could have conferred on him by designating such road as the post route, and if we are mistaken in the opinion that the turnpike is not,, *124 in all respects, a State road — still, nevertheless, we would be of the opinion that the exaction of toll in this case is neither unauthorized nor in any degree subversive of the supreme power of Congress “ to establish post offices and post roads.”
There are those who doubt whether, in giving to Congress the power to establish post roads, the people of the States intended to surrender to the general government,. as a matter of right, the use of any and every State road upon any other terms than each Slate, for itself, might think fit to prescribe. The principal ground of this opinion is a belief that the only motive for giving to Congress the power to establish post roads, as well as post offices, was an apprehension that, without some such independent national power, a failure by any one State to provide roads in every respect suitable for post roads, or a refusal, at any time, to permit the mail carriers to use any one of the roads of any one State on reasonable terms, might injuriously obstruct the transportation of the national mail, and tend to frustrate the only end for securing which the entire control of post offices and post roads was surrendered by the States to the general government.
And hence it is argued that one chief object of giving the power to establish post roads, implied an admission # of an antecedent power in a State to prescribe its own terms for the use, by the general government, of a State road, and that, therefore, the power to establish post roads does not include the right to designate and use State roads without the consent of the State, but is an ultimate and more transcendental authority to make and repair national roads for post roads whenever the unfitness or unreasonableness of State policy may render such a course expedient.
But we shall not discuss that question; for, conceding, as we do, that the power to establish post roads includes the right to use State roads upon common and reasonable terms, we are also satisfied that it is much more efficient and comprehensive, and was given only for purposes very different from any such end as that of authorizing Congress to use State roads on its own terms.
*125 We will therefore submit some general suggestions as to the character and extent of this high power.
Whether we consider the popular use of the word “establish,” or the definition of it by the most approved lexicographers, or the admitted import of it in the preamble and in the fourth clause of the eighth section of the federal constitution, it must be understood to mean, not merely to designate, but to create, erect, build, prepare, fix permanently. Thus, to establish a character, to establish oneself in business, to establish a school, or manu-factory, or government — all common and appropriate phrases — is not to assume or adopt some pre-existing char- • acter, or business, or school, or manufactory, or government. To establish, in each of those uses of the phrase, clearly expresses the idea of creating, preparing, founding, or building up. In the same sense, too, it is used and understood in the bible; thus it is said, “The Lord “ by wisdom hath founded the earth; by understanding “hath he established (prepared) the Heavens.” Proverbs, iii. 19.
Just so, also, is it used and understood in the federal constitution. Thus we find in the preamble these words, “establish justice;” “establish this constitution;” and in the fourth clause of the eighth article, power given to Congress, “to establish an uniform rule of naturalization, “and uniform laws on the subject of bankruptcies, “ throughout the United States.”
Thus we might present almost endless illustrations of the faet, that the popular and philological, sacred and profane, oracular and political import of “ establish,” is not to designate, but to found, prepare, make, institute and confirm.
It appears to us, therefore, that “to establish post offices and post roads” means, ex vi termini,not only the designation and adoption of an existing house and road for a post office and a post road, but also, more comprehensively, the renting or building of a house, and the construction and the reparation of a road, and the appropriation of money for any of those national purposes, whenever any of them shall be deemed useful. And the unquestionable fact that ‘to establish’ imports to make or create, in every other place where it is used in the con *126 stitution, and especially in the fouth clause of the eighth section, tends persuasively, if not conclusively, to prove that the same words, used, without any qualification, directly afterwards in another clause of the same constitution, were understood in the same sense in which they were employed in the antecedent clause, as well as in the preamble. We can perceive no ground for discrimination. The subject matter of the two clauses is not of a nature so essentially different as to authorize a more comprehensive interpretation of the power in the one clause, and a more restrictive construction of it in the other; and the object was the same in both: that is, to place the United States above dependence on any one of the Slates, so far as naturalization, and bankruptcy, and post offices, and post roads, might be concerned, as national objects.
A post office cannot be established without a house, and a postmaster, and the adoption of rules for regulating the office and the transmission of the mail; and therefore, all of these are necessarily constituent elements of the comprehensive power 11 to establish post offices.'1'1 And consequently, if Congress deem the buying or building of a house, for a post office, expedient, it may and should buy or build one; and the power to do so could not be questioned; because, having supreme authority “to establish post offices,” Congress must, of course, possess all subsidiary power “necessary and proper” for effectuating that authority; and therefore — a house being indispensable to the existence of a post office — whether a house shall be rented, or bought, or built, is a question altogether of expediency, and not, in any degree, or in any case, a question of power.
So, too, as roads, and good roads, are indispensable to the effectual establishment of post roads, the supreme power “to establish post roads” necessarily includes the power to make, repair and preserve such roads as may be suitable for the most speedy, certain and effectual transportations of the mails, in coaches or otherwise, as may be best for fulfilling the ends of the very important national power “ to establish post offices and post roads.’» And consequently, whether Congress shall, in a special *127 instance, construct a post road, or appropriate money for constructing one, or whether it shall adopt a road already made under State authority, and use it as it is, and as the people of the State use it; or whether, after making a road, or adopting an existing road, Congress shall repair and improve it, or contribute to those objects when the national interests require the reparation and improvement of it, or shall depend entirely on the will and judgment, purse and labor of the State, or of any portion of the people of the State, are all questions of expediency merely, and, in our judgment, neither of them can ever be a question of constitutional right.
If it be the interest of the United States to carry the mail in stage coaches, directly from one point to another, between which there is an interjacent wilderness, without any road or a sufficient road, cannot Congress open a road? If it cannot, then it has not power “to establish post offices and post roads” wherever the public interest requires, or in the manner most advantageous.
If, after a State road shall have been adopted as a post road for the transportation of the mail in coaches, it shall have been rendered unfit for such use, in consequence, chiefly, of dilapidations effected by transporting the mail upon it, cannot Congress repair the damage it had done? Or, if the State fail or refuse to keep the road in a suitable condition for such public use, may not, ought not, must not, the general government preserve it, so as to be able to use it advantageously as a post road? Or if, on an important post route, where the mail is carried in coaches, a bridge should be necessary to the safety and proper celerity and certainty of transportation, and the State fail or refuse to make any bridge, may not, should not, Congress have one made, and appropriate the money required for constructing and preserving it? A negative answer to either of these questions would necessarily imply that Congress cannot “ establish post roads ” in the only true and effectual sense; for, “to establish a post road,” in the most restricted sense, is to designate, keep and preserve such roads for post roads as the public good shall require.
If, after a State road shall have been adopted or estab- *128 Hshed as a post road, the State discontinue it as a State road, will it not still be a post road as long as the law establishing it as such shall remain unrepealed? If not, then a Stat® can control the general government in the esta.b-lishment of post roads, and, by the occlusion of a road constitutionally established as a post road, may destroy it, and ia effect, repeal the law by which it was established. This cannot be; for if Congress had power to establish the road as a post road, it must have the power to keep it open and use it; because, the law by which it was established,must be the supreme law of the land', and should operate as such until it shall have been revoked by Congress, Then, in the event of a discontinuance of the road by the State, may not the United States still continue it as a post road? And, in the event of an actual occlusion by the State, has Congress no power to re-opeu it, and keep it open and Jit for use as a post road?
These questions- are, we think, too plain for grave debate or serious doubt.
But, if Congress can thus reconstruct or repair a road for a post road, its power to make one de novo cannot be consistently doubted.
Then it must, as we think, be admitted that there may be cases in which Congress has the constitutional authority to repair, reconstruct, and even make, roads for post roads.
■ But if the power exist in any case, it must exist in every case in which a post road is necessary or is established.
Powrer, and the expediency of exercising it, are obviously distinct and essentially independent things. The inexpediencS of ah act of Congress does not prove that it is unconstitutional; nor can its expediency prove its constitutionality. A declaration of war against England . might, at this time, or possibly at any time, be unjust and impolitic; but the constitutional authority of Congress to declare war, now or at any time, against England or any other nation, whether with or without sufficient cause, is express and undoubted. It might, and doubtless would, be essentially inexpedient for Congress to abolish slavery in the District of Columbia; but, having *129 full and exclusive legislative authority over that district, it may nevertheless be true that Congress has power to enact that there shall be no slavery there.
It might even now, in the opinion of many persons» and possibly may, at some future day, in the judgment of a majority of the people of the United States and of Congress, be expedient to abolish slavery in all the States. But, nevertheless, no rational mind could doubt that Congress has no power to legislate on that subject.
It may be inexpedient to establish a post office at a particular place, but the power to establish one at any place in the United States, is unquestionable. So, too, where there is a good State road, sufficient for every proper purpose as a post road, Congress would doubtless consider it more expedient to adopt such a road than to make anew one; and,if the State should choose to keep the road in good and suitable condition, without claiming any contribution from the United States, or exacting any compensation for the use of it as a post road, an appropriation of money by the general government, for aiding the preservation of the road, however just it would be, might be" deemed by Congress unnecessary and inexpedient. But the power to make or repair the road should not therefore be denied or questioned.
All the powers over post offices and post roads which the States ever possessed, have been wisely transferred, as one indivisible national power, to the general government, which now possesses, of course, all the authority, in that respect, which all the people of all the States, either aggregately or in separate State sovereignties, 'could possess and delegate. And under the plenary power to establish post roads, Congress must, therefore, have as much right to make and repair roads as the States ever had, for the purpose of having suitable post roads. The consent of a State'is not indispensable; for, if the 'constitution give the power, it exists without the concurrence of any State; and if the constitution did not delegate the power to Congress, the consent of a State, or of all the States, could not give it without an amendment .of that national charter, from which álone Congress derives or can derive legislative authority.
*130 And, if the power to make or repair post roads, be not express, but be only implied, the question whether ¡t exjst jn a given case, does not depend on that of the expediency or inexpediency of exercising it. An implied power, in the proper political sense, is a right to use a suitable mean for effectuating the end of some express power. And consequently, the question whether a power, not expressly given, is implied, does not depend, either on the expediency of exercising it, or on the usefulness of the end to be accomplished by exercising it; but depends altogether on whether the thing done or to be done be necessary and proper as a mean for effectuating the end of any power expressly given to the general government. Thus, if a National Bank be a suitable agent for carrying into complete effect any one power expressly delegated to the general government, and if, as a mean for that purpose, it would have an obvious relation to the end of any such power, and be adapted to the fulfilment of that end, Congress undoubtedly has the implied or incidental power to establish such an institution. But if, when established, it would have no relation, as a mean to such an end, Congress could have no power to establish it — however expedient or salutary it might be admitted to be in its influence on the enterprize and business of the people of the United States.
Wherefore, we conclude that, as it must be admitted that, in some cases which might occur, Congress has express power to make and repair post roads, the question whether it should make or repair any or every post road, is one of policy and not of power; and that therefore it has express power to make and repair post roads, whenever it shall deem such a course useful and proper.
If the power to establish post roads should even be restricted to the designation and continued use of roads, the power to remove obstructions, re-open the roads when closed, and repair them when repairs are necessary, so as to secure a proper and advantageous use of them as post roads, as long as Congress shall choose to continue them as such, cannot, as we think, and have before suggested, be doubted by any considerate and dispassionate mind. And the power to keep, as a post road, any road *131 once established as such, and to re-open and repair it, is but the power to make a post.road.
But if the powers we have been considering, be hot such as should be deemed express, we are clearly of the opinion that they are all implied.
No person, so far as we know or believe, now denies the existence of implied powers in the general government. The federal constitution itself shows that such powers were contemplated by those who adopted it;,for it expressly declares that Congress shall have power “to “ make all laws which shall be necessary and proper for “carrying into execution” the powers expressly delegated to the government of the United States; and the first amendment adopted by the people necessarily concedes the existence of implied powers; because it interdicts acts of congressional legislation for which there was no express grant of power, and which, therefore, must have been considered as having been authorized by incidental or resulting powers.
But, without either of those concessions of implied powers, such powers would have existed to as great an extent precisely as they do now exist; for it is a self-evident truth, that an express and unqualified power to do a thing, necessarily implies the power to use all the means necessary and proper for doing it effectually;'that is, such means as will effect the end of the express grant, and are neither inconsistent with the object of the grant, nor have been prohibited. The constitution only designates certain general ends, and expressly confers' only certain comprehensive powers. Subsidiary powers are implied, and could not have been enumerated. All powers necessary and proper for executing the enumerated powers, or for fulfilling the duties imposed by the constitution, are implied, and exist as certainly ■ as if they had been expressly given — excepting so far only as they shall have been prohibited.
Between the strict constructionist and the latitudinarian, there is no dispute as to the general fact that implied powers exist. The only difference of opinion among rational men, is that which exists respecting the true test for ascertaining when a power is implied, and *132 that also, which must ever exist concerning the extent of implied powers. All admit that there is implied power to adopt any mean that is “necessary and proper'’ for effect'ng the end of any express power. But enlightened men disagree as to what is “necessary and proper,” and also, as to the kind or degree of necessity which must exist before power will be implied.
But if power to adopt a particular mean for attaining the end of some express power, should not be implied unless that mean be indispensable — that is, unless the express power cannot otherwise be executed — then it is demonstrable that there can be no implied power; for it is evident that suitable or effectual means for executing every express grant or power, are various, and of almost infinite modifications; and therefore, no single mean can, be deemed indispensable, because the power may be executed by some other mean. But, although no one mean alone can be deemed indispensable, yet, as no end can be accomplished without some means, all the means which are adapted to an end, and will effectuate it, are necessary, and each is equally, and in the same sense, necessary. And therefore, if any one of them be constitutional, any other of them must be equally so, unless it be prohibited by the constitution, or be subversive: of some fundamental principle, and therefore would not be “proper” as well as necessary. And, of course, in choosing between “proper” means, thus equally necessary in the political sense, the question is one of expediency only, and not of power. This is illustrated by practical proofs abundantly furnished in the history of national legislation, every year since the commencement of the federal government.
Then, as a road can neither be made, nor preserved fit for use, without labor or money, and generally both— can it be doubted that, in fully and effectually executing the express trust of establishing post roads, Congress may have- the implied power to appropriate money to construct, or help to construct, and to repair, or aid in repairing, a road necessary for a post road? or to pay a just compensation for using and impairing a road made and repaired-by State authority and State means-alone? *133 This should certainly not be doubted by any, except such persons as could deny that the power “to establish post offices and post roads” embraces the power to superintend and regulate the mail, and to do, also, whatever may be “necessary and proper” for securing the transportation of it, as distributively, cheaply, speedily, and safely, as the public interest may require. It cannot, surely, be seriously doubted by any person who admits that, under the power “ to establish post offices and post roads,” the general government may appoint postmasters, make contracts for carrying the mail, on horses, or in coaches, or in steamboats, require the citizen to pay postage, and punish him, “ even unto death,” for obstructing or robbing the mail.
By the comprehensive power “to establish post offices and post roads,” the people who adopted the federal constitution intended to give to the national Congress all the power necessary for controlling the entire mail establishment of the Union, in such a manner as most certainly to effectuate the end for which the general power was delegated; and that was, the prompt, punctual, and certain distribution of intelligence, without any of the inconveniences, obstructions, or delays, that might be apprehended from discordant and inefficient State regulations, or from any- necessary dependence on State authority or State will. And therefore, as the general, and not the State government, is responsible for the' faithful and satisfactory execution of this important trust, and must, of course, possess, not only the exclusive right to decide as to the best modes of fulfilling it, but supreme power to provide and enforce the requisite means for attaining the general end, it must have the authority to judge whether the roads'in any State are suitable or sufficient for proper post roads; and if, in its judgment, there, be, any where-, any. deficiency of road facility, it must have the implied power to supply the deficiency, either by construction, re-constructioü, or reparation, as it shall consider most expedient..
A State cannot claim the right to decide whether she has all the roads which the general government needs for transporting the mails; nor whether all her roads are *134 in a suitable condition for post roads; nor can the general government be required to depend altogether on any State for the reparation or preservation of post roads; f°rs these respects, the States, having retained no power, can claim the right to exercise none.
The prevailing practice of the general government has been to adopt State roads as it finds them; to use them as the people of the State use them; and to leave to them not only the whole burthen of making and repairing all roads, but the discretion to decide how and when such as have been established as post roads shall be repaired, improved, altered, and changed. This may be expedient in many, perhaps most, instances. But it is often unjust to the several States, and may be essentially prejudicial to the interests of the United States. When a road is dilapidated by the use made of it by the general government, it would be but just for that government to repair the injury it had done: power to do such justice cannot surely be denied; and when a post road is not kept, by State authority and State means, in such a condition as the interest of the United States requires that it should be kept,for the most effectual transportation of the mail, the general government should, with its own means, improve and preserve it as it should be improved and preserved.
Emery post road is a national road. So far as it is a post road, it is as national as the Chesapeake Bay, or the Mississippi river; because, so far as it is such a road, the people of all the States have an interest in it; and therefore, to that extent, it is undoubtedly a United States road, and may, of course, be repaired and improved by the United States.
By the articles of confederation, as before suggested, the confederate Congress had express and exclusive power “ to establish post offices?’ but, as it possessed no implied power, it had no authority “ to establish post roads.” Nevertheless the confederation appointed postmasters, established post offices, superintended and directed the entire mail of all the States, and used, without question or complaint, the State roads, just as they have been generally used since the adoption of the federal *135 constitution. But, notwithstanding this practical interpretation of the power “ to establish post offices,” the Federal Convention, and the people who ratified the constitution proposed by it, felt that the power “toes-tablish post offices'” was not sufficiently ample; and thei-e-fore, they added to it the auxiliary power, also, “to establish post roads.” This historic fact alone tends directly and persuasively to show that the power “to establish post roads ” was intended to include more than an authority merely to designate post routes; for otherwise — as that authoi’ity had been possessed and exercised under the isolated power “to establish post offices”— there was no motive for superadding the express power to establish “post roads”
We cannot, therefore, resist the conclusion that the power to establish post roads is something more than the power “to establish post offices;” that the former is, as to post roads, as plenary and supreme as the latter can be as to post offices; that both together were understood and intended to embrace every thing necessary and proper for regulating and transporting the mails of the United States in such a manner as the national Congress should deem best, and choose to provide for and prescribe; that consequently, Congress must have at least implied power to make, improve, and repair post roads, whenever and wherever it shall consider such a course necessary and proper; and, a fortiori, the implied, or rather the resulting power, to appropriate money to any of those national purposes.
Congress has not, for obvious reasons, established the habit of either making or repairing, or of appropriating money to make or repair, post roads; neither has it established the habit of even designating the roads on which the mail shall be carried. But the general practice is no proof as to the constitutional power of Congress in the one case more than in the other. Notwithstanding the habitual failure to designate post roads, the power to do so is unquestioned; and notwithstanding the habitual forbearance to make or repair, or appropriate money to make or repair, post roads, the power to do each and all of these things is, as we, with equal confidence, believe, *136 clearly implied, if not expressed. And we have no doubt that many losses, disappointments and vexations have occurred in the mail department, and to the people, in consequence of the failure by Congress to provide such post roads, and improve and repair them in such a manner as the nature and object of the trust confided to it by the constitution, authorized and required; and we have as little doubt that the making of a good post road in a State, or appropriation of money to make or improve, or aid in making or improving, a post road, by the general government, could never be injurious to the State.
Congress has not adopted the practice of building and keeping federal prisons and court houses in the several States, because the liberal comity of the States has sufficiently supplied the general government with the use of those necessary appendages to the national judiciary. But who can doubt the power of Congress to build and to keep a federal court house and jail in every State in the Union? ■
The power to appropriate the money of the United States to the purpose of meeting any of the demands of the general government, or of executing fully and most : effectually, any trust confided to it, cannot be doubted. Indeed, it might be admitted that every government, as an artificial person, may, like a natural person, have an inherent or resulting power to dispose of its own money in any way not prohibited by the organic law of its being, nor inconsistent with the end of its creation. And surely there is no such limitation, express or implied, upon the power to appropriate the money of the United States, as could prevent' the application of it judiciously to the purpose of facilitating the proper and expeditious transportations of the national mails.
Can any rational and consistent man, who claims for the general government the harsh and ultra power to use ad libitum the roads of a State, without either compensation .to, or consent by, the State, deny or doubt that Congress has power to appropriate money to make, or to repair, or to pay for the use of, public roads in a State, used or to be used as post roads? We cannot believe that *137 any such suicidal inconsistency will ever be exhibited by many national statesmen or jurists.
But the power to pay for the use of a State road necessarily implies power to appropriate money to repair, or even make, post roads.
. Had either of the States been alone interested in the mails within their respective borders, the power to establish post offices and post roads would never have been given to the Congress of the United-States. But, the mail being international, all power- over it and over all means necessary and proper for making it most effectual, was therefore transferred to the councils of all the States united into one common government for purposes common to all. And, as all power over the mail, and over post roads, has been thus surrendered to the general government, and as all the people of all the States have an interest in the execution of that power in each State, there can, in our opinion, be no semblance of either justice or authority for a pretension by the national government to a constitutional right, either: to require a State to make or repair post roads with its own labor or money, without any assistance or retribution from the other States; or, in every instance, to defer to the several States the discretion of having good or bad post roads, as their parsimony or liberality, poverty or caprice, may happen to prevail, and thus virtually to surrender to them,individually this important national trust.
It may be generally best for the general government to avail itself of the use of State roads in such condition as the State may be pleased to- keep them, and upon such terms as she shall choose to prescribe. So, too, and more obviously and generally, it may be best for the general government to use, in the like manner, the jails and court houses of the several States. But the power, in each class of cases, to execute the national trusts, independently of State provision or State, consent, is equally unquestionable; and, in the case of post roads, the occasional exercise of that power would doubtless be, not only just, but greatly advantageous.— Where there shall not be, in evéry respect, a suitable post road, it is, in our opinion, the duty of the general *138 government to employ all the means which shall be necessary and proper for securing such a road as the public interest demands. But if it will not do so, or when it chooses to repose on State authority, and rely on State expenditure, it must use roads as it finds them, and cannot claim privileges to which the people of the State are not themselves entitled; and if a uniform and general toll be exacted, Congress cannot complain that its authority had been resisted, or, in any degree, impaired.
We therefore conclude, first — that the power to establish post roads was given for the purpose of enabling the general government to make, and repair, and keep open, and improve, post roads, whenever the exercise of any such independent, national power shall be deemed proper for effectuating the satisfactory transportations of the mails; second — that it was not given.for the purpose of authorizing Congress to adopt and use State roads as post roads, without any compensation, if any should be just, and should be demanded; third — that, so far as the designation and use of any State road as a post route, may be concerned, the power to establish post roads cannot import more than the precedent power to establish post offices, and transport the mails — excepting only, that the one implies only a right of use, upon just and common terms, as long only as a State shall choose to continue a road as a State road, and the other may imply a right in Congress, not only to enjoy the like use, but to continue, as a post route, a road once adopted or designated or established as a post road, even after it shall have been discontinued as a State road •, fourth — that, unless Congress shall elect to exert its right of eminent domain, and buy a State road, or make one, or help to make or repair it, the constitution gives no authority to use it as a post road, without the consent of the State, or owner, or without making a just compensation for the use; and, fifth — that therefore, even if the Lexington and Maysville turnpike should be deemed a public State road in all respects, and if Dickey, as mail contractor, has a right to transport the mail on any public road he may prefer or choose to adopt between Lexington and Maysville, he cannot do so, nor'had Congress power to *139 authorize him to do so, without paying for the use, if demanded, a just compensation, and that is — prima facie at least — what other persons are required to pay for a similar use of it.
After refusing, as it did, by the President’s veto, to contribute any thing to the construction of the Maysville and Lexington turnpike, the general government could not, with any semblance of consistency, justice, or grace, claim the right to use and impair it, by carrying the mail upon it, in coaches, without paying to those who did make it, with their own private means, as much for the use and delapidation of it, as they have a legal right to exact, and do receive, without objection, from all others who enjoy the use of it, by travelling upon it in carriages.
Wherefore, as, in every view we have taken of this case, no power of the general government has been either exercised, or resisted, or defied — it is clearly our opinion that Dickey, as mail contractor, can, as a matter of right, use the Lexington and Maysville turnpike road only as others have a right to use it; and that, therefore, he may be, justly and constitutionally, compelled to pay the prescribed toll for such use as' he shall elect to make of it, for his own advantage and convenience.
It is therefore considered, that the judgment of the Circuit Court against the appellant be affirmed.