# Case No. 674.

## AVERY v. FOX.

### [1 Abb. U. S. 246.][2]

Circuit Court, Sixth Circuit. W. D. Michigan. Jan. Term, 1868.

#### NAVIGABLE STREAMS—INJUNCTION.

1. The owner of land bordering upon a stream, although navigable, in which the tide does not ebb and flow, is presumed to be the owner of the land beneath the water to the center line of the stream.

2. Such riparian proprietor has also a right to use the water of the stream, in its flow, in any manner not inconsistent with the rights of others in it.

[Cited in Rutz v. City of St. Louis, 10 Fed. 341.]

3. But the public have the right to use all navigable streams as highways; and the owner of the bed of such a stream has no right, as such, in the waters thereof, which can authorize him to impede or obstruct navigation upon it. The right of the public, for purposes of navigation, is paramount to that of the riparian proprietor.

[Cited in Rutz v. City of St. Louis, 10 Fed. 341.]

4. The government of a state may authorize alterations to be made in the course, width, etc., of navigable streams, with a view to afford greater facilities for navigation; and for this purpose may take the property of a riparian owner, upon complying with the constitutional requirement to make compensation therefor.

5. The government of the United States may authorize similar alterations in navigable streams, for the purpose of affording increased facilities for navigation between the states; and for this purpose may take the property of a riparian owner. But they can only take such property upon making or providing for just compensation.

6. If an alteration in the course of a stream, by diverting it from its natural channel to an

---

[1] [The cases referred to are officially reported as follows: Cookson v. Toole, 59 Ill. 515; Hoker v. Boggs, 63 Ill. 161; Parent v. Callerand, 64 Ill. 97; Schmidt v. Postel, 63 Ill. 58.]

[2] [Reported by Benjamin Vaughan Abbott, Esq., and here reprinted by permission.]

artificial one, for the purpose of improving navigation, results in depriving the riparian owner of the use of the stream which he is employing advantageously as an incident to his land, this is taking the private property of such owner, in the use of the water, for a public use; and he is entitled to compensation.

[Cited in Rutz v. City of St. Louis, 10 Fed. 341.]

7. Although the courts cannot directly restrain the government of the United States, nor the action of the president as the executive power, nor that of congress as the legislative department; yet when congress makes an appropriation for a public improvement, and commits the execution of the work and the expenditure of the money to one of the departments, which in turn employs agents to carry forward the work, neither such department nor its agents will be exempt from the restraining power of the courts, if either seek to execute the law in an unconstitutional manner;—as, by taking private property against the consent of the owner and without compensation.

[See note at end of case.]

8. Private property cannot be taken for public use until compensation is actually made. It is not enough that a provision is made by law for ascertaining and making compensation afterwards.

In equity. Motion for a preliminary injunction. Denied.

C. A. Kent and C. I. Walker, for the motion.

E. S. Eggleston and L. Patterson, opposed.

WITHEY, District Judge. The bill in this case is for an injunction against defendants, contractors and employes in constructing a new channel from White lake into Lake Michigan. Based on bill and affidavit, a motion is made for a temporary injunction to restrain defendants from proceeding with the work. It appears from the bill that White lake is four miles long and one mile wide; that with a commodious channel for entrance, this lake would afford one of the best harbors on Lake Michigan. White lake is separated from Lake Michigan by a strip of land about 50 rods in width. White river empties into White lake, is for a distance of about 5 miles, immediately above the lake, a stream from 100 to 200 feet wide, from 3 to 8 feet deep, and running from 2 to 3 miles per hour. The outlet of White lake is also called White river, is from 75 to 200 feet in width, and in the channel, generally, from 4 to 10 feet deep, and runs from the western part of the lake northwesterly, parallel with the strip of land between the two lakes. about three quarters of a mile. It then turns west and runs 40 to 50 rods to Lake Michigan. Westerly winds blow sand from said strip of land into the outlet, so that the channel is kept in a navigable condition only by the action of the current, and by large expenditure annually of money in removing such deposited sand.

Complainants own 70 acres of land lying on the outlet, on which is a steam sawmill and other buildings and improvements, the value of which is not less than $50,000. They also own lumber lands up the White river, and are accustomed to supply their mill with logs through White river, White lake, and the outlet. There is a bayou near their mill, wherein logs are stored—logs are taken from the bayou through an opening into the outlet to the sawmill as wanted. Complainants have a steam tug which runs between said lakes, aiding in the transportation of logs and lumber. All vessels passing from one lake into the other must go by complainants' property through the outlet. They also have a pier extending from the mouth of the outlet into Lake Michigan. Their lumber, when sawed, is received by vessels coming from Lake Michigan, at a dock near the mouth of the outlet.

The congress of the United States has appropriated $57,000 for the improvement of the harbor at White River, to be expended under the directions of the war department. The war department, through its agents, has caused examinations and surveys to be made with reference to the work of improvement, and regards the improvement of the present outlet as impracticable, and has commenced the work of cutting a new channel through the sand bank or strip of land lying between the two lakes, making a straight cut of 200 feet in width and 12 feet deep, from deep water in Lake Michigan to deep water in White lake.

Complainants claim that the opening of this new channel must result in the rapid closing of the old outlet, because the new channel will be very much wider, deeper, and shorter than the old. As a natural and necessary consequence, they say, the water of the inner lake must seek the level of Lake Michigan through the new channel; the descent must be more rapid, as the distance is less; its greater depth and width will contribute materially to make the water prefer it to the old channel.

Several legal questions have been presented, involving the rights of riparian proprietors upon the navigable waters of the state; the rights of the public in, and particularly as to the power of the general government to divert or obstruct such streams in making harbors for the convenience and protection of commerce and navigation, and other questions which I shall have occasion hereafter to refer to. Without reference to the other facts of the case as presented by complainants and defendants, as to whether complainants will, by the opening of the proposed new channel, be deprived of enjoyed vested rights to such an extent as to justify the exercise of the restraining power of the court for their protection—I will first pass upon the legal questions that have been urged upon my consideration.

1. The outlet of White lake is a navigable stream, and the law is too firmly settled to allow of discussion at this day, that the owner of land bordering on a navigable stream, in which the tide does not ebb and flow, owns the land beneath the water to the center thereof. Neither the nation nor state owns

the beds of navigable streams within the state, but the riparian proprietor is owner thereof. It is equally well settled as law, that a riparian proprietor has a property in the use of water flowing by his premises; that is, a right to use it in its flow, in any manner not inconsistent with the rights of others to its use. If, then, the law recognizes such individual property, or, which is the same thing, individual right, in the use of water flowing past or through the land of a person, can such stream be so far obstructed or diverted as to deprive such owner of the use of the water? Clearly not. If the owner of land adjoining such stream has a mill which obtains its motive power therefrom, the water of such stream cannot be so far obstructed or diverted as to deprive his mill of its motive power, nor so as seriously to diminish the needed power. If the stream be navigable for crafts of any sort, for logs and lumber, and be used for any or all these purposes, any diversion or obstruction of the water accustomed to flow there, which should render navigation either impossible or difficult and more expensive, would be unlawful, and in either case, on a proper showing, should be prevented by injunction.

This right of private persons to the use of water as it flows by or through their lands, in any manner not inconsistent with the public easement, is as sacred as is the right of a person to his land, his house, or his personal property. The public, however, have the right to use such streams as are navigable as highways, and the owner of a bed of a stream has no rights in the water thereof which will permit him to use it to the injury of the public. He cannot so far divert the water to his private use as to render navigation impossible or difficult, nor can he place obstructions in the stream in a manner to produce such results. His right and the right of the public to the use of the water of such streams are to remain unimpaired as far as possible, but the right of the public for purposes of navigation is paramount, and there can be no use of the water by a riparian proprietor inconsistent with the public easement. The law, as thus understood, does not deprive a state of the right to improve its navigable rivers, nor indeed to permit the damming or bridging of such streams, providing navigation is not thereby obstructed, as when suitable locks or draws are provided through which navigation is secured to the public. And so, too, a state, which by its constitution is not prohibited from entering upon works of internal improvement, may cut channels around rapids or carrying places to afford greater facilities for navigation, so as to enable crafts to pass such carrying places which could not be done without, or only in times of high water. In doing so, the state as well as individuals must respect the right of riparian proprietors, and not deprive them of such enjoyed use as they are entitled to have continued in the water, to an extent to produce irreparable injury.

Mere inconvenience to the private citizen resulting from any such public improvement may well be ignored for the greater benefit to the public, and be made to give way from principles of public policy.

2. But upon principles of public law, which are recognized in most of the state constitutions, and in the constitution of the United States, private property cannot be taken for public use without making just compensation. The right of eminent domain, which is the right that the people or government retain over the estates of individuals to resume the same for public use, is a right that carries with it the duty to make just compensation to the individual whose property is taken.

3. I now come to the question whether the United States, either from motives of public policy or the power given to congress by the constitution, to regulate commerce among the states, can lawfully, in the improvement of harbors of national importance and concernment, such as the one at White lake is conceded to be, change the outlet of the small lakes or mouths of rivers, so as to deprive persons owning lands bordering the same entirely of the use of the water as it naturally flows by or through their lands. The United States have a right to make the cut between White lake and Lake Michigan—the land, where the proposed cut is to be, having first been secured—provided thereby private interests are not seriously impaired or private rights destroyed. It is an incident to the sovereignty of the United States, and a right recognized in the constitution, in that clause which prohibits the taking of private property without just compensation, that it may take private property for public use—of the necessity or expediency of which congress must judge, but the obligation to make compensation is concomitant with the right. Bonaparte v. Camden & A. R. Co., [Case No. 1,- 617;] Dickey v. Maysville & L. Turnpike Co., 7 Dana, 119. In the last case the court say, "The national power to use the land of a citizen or state for an armory or fortification is undoubted and irresistible; the constitutional obligation to pay the owner a just equivalent, if it be demanded, is equally undoubted and irresistible." The case involved the right to carry the United States mail over the road of a turnpike company without payment of toll, and at page 115 the court say, "The right to use private property for a mail route—as for any other national purpose, being qualified by the constitutional condition that a just compensation be made for the use, unless the owner voluntarily waive it—does not imply an authority to take, or to use for post office or post road purposes, the land or the house of a citizen, or the railroad or macadamized road of associated citizens, without paying to the owner or owners a just compensation." The principle of that case is directly in point. The legislature of the state, or the congress of the United States, possesses whatever power exists in

either government to take private property for public use, and to provide compensation. If now the power to take may be exercised alone,—when we find that the lawmaking power is alone judge of the necessity or expediency of taking,—there will be found no check to its most arbitrary exercise. And as was said by Chief Justice Marshall, in Fletcher v. Peck, 6 Cranch, [10 U. S.] 135, if any limits to legislative power be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation? To divert a stream from its natural channel into an artificial one, for the purpose of affording improved navigation and benefiting commerce, may be a work of great public concernment and advantage, but if thereby a riparian owner is wholly or injuriously deprived of the use of its waters, which he is employing advantageously as an incident to his land, it is taking the private property of such owner in and to the use of that water for public use, and unless just compensation is made, is against both the principles of the common law and the provisions of the constitution of the United States, and courts have no alternative but to so administer the law as to secure and protect such rights in a proper case.

4. It was urged upon the argument that the United States is prosecuting the White River harbor improvement, and as a sovereign power, cannot be restrained. The United States cannot be brought before the court as a party defendant in the record; the courts cannot restrain the president of the United States as the executive power of the government, nor congress, the lawmaking power; but when congress makes an appropriation to improve a harbor, and commits the direction of the work and expenditure of the money appropriated to the war department, which employs its agents to carry forward the work, neither the war-department nor its agents will be exempt from the restraining power of the court, if either seek to execute the law in an unconstitutional manner, by taking private property against the consent of the owner, without compensation. The war department is not acting as the executive, nor as the agent of the executive power, but ministerially. If the court has jurisdiction of the subject-matter and person of the defendants, I know of no rule which would exclude from the process of injunction any person on account of the character or capacity in which he acts, although such character or duty be conferred or imposed upon him by the law of a state or of congress. 1 Baldw. 206, [Bonaparte v. Camden & A. R. Co., Case No. 1,617.]

5. One further question is suggested by the argument and from the considerations which I have given, viz.: When is compensation to be made? Or may private property be taken or private rights be impaired before compensation made, if by some law provision is made for ascertaining and making compensation? I regard the just rule to be, that the taking of private property should not be allowed until compensation is actually made, thus imposing on the owner no burthen of seeking or pursuing expensive remedies, and leaving him exposed to no risk or expense in obtaining compensation. 1 Baldw. 227, [supra.]

6. If, then, the facts of this case bring the complainants within the rules of law as indicated in my views already expressed, the work which is being prosecuted by defendants should be prevented by injunction. I have already stated most of the allegations of the bill in substance. Complainants therein state that the strip of land between the outlet of White lake and Lake Michigan, is in part a mere sand bank, and westerly winds blow this sand into the river in great quantities, so that the channel is kept navigable only by the action of the current and by artificial means. Great expense is necessary every year, on the part of parties interested, to keep the channel clear of the sand which drifts in. They also say that, in their judgment, the opening of the new channel must result in the rapid closing of the old outlet. The wider, straighter, shorter and deeper channel proposed will naturally and necessarily result in causing the waters of White lake to seek the level of Lake Michigan through the new channel. And they say that any diminution of the accustomed supply of water in the present outlet would tend to injure their property, since there is now hardly enough; and that if the current should cease to flow, even though the water should remain as deep as at present, the expense of getting logs from White lake to the bayou would be seriously increased and the value of their property diminished.

The evidence in support of the bill is the affidavit of Col. J. D. Webster, who from 1838 to 1854 was an officer of the topographical engineers of the United States army, and for several years had charge of government harbor improvements on Lake Michigan, is familiar with the shores of the lake, has given great attention and reflection to the action of the winds and currents thereof. He states that the effect of the new channel will be that almost the entire water passing from White lake to Lake Michigan will flow through the new channel, and that there will remain but little or no current in the old channel. That in consequence it will be gradually but surely filled with sand, and within a few years closed for all practical and useful purposes. But this opinion is based upon causes operating in the absence of the use of artificial means to aid this channel by dredging out the sand, as now employed. He thinks no considerable effect, in keeping the present channel open after the completion of the new, would result from the running back into Lake Michigan of the waters which are by strong westerly winds blown into White lake.

The defendants, in opposition to the motion for injunction, present three affidavits, no an-

swer having been filed. Col. J. B. Wheeler, of the United States army, who, under instructions from the secretary of war, has charge of the work of constructing the proposed new channel, gives full information as to the surveys for the work, the report to the war department, and among other items, the report says: "It is hardly possible that any reasonable expenditure of money upon this (the present) entrance and portion of the river or outlet would give us a harbor suitable to the wants and necessities of the general commerce on Lake Michigan." And further, in reference to the locality of the proposed new channel, it is said: "By examining this locality we see that there is deep water in both lakes near the shore, and that there, the distance between the twelve feet waters in each, is only twelve hundred and fifty feet. This, then, is the place where the channel should be made."

The secretary of war transmitted this information to congress, and the appropriation was thereupon made, and Col. Wheeler was directed to proceed with the work accordingly. Col. Wheeler says: "Whether the opening of the new channel will necessarily close the old one, is a subject of speculation."

John D. Sturtevant states his residence at White lake since 1861, and from his observations as to the action of the waters on the east shore of Lake Michigan, it is his opinion that the effect of opening the new channel, as proposed, will not be as stated in the bill and by Col. Webster in his affidavit, but that the present outlet will not be filled or closed. The affidavit of Charles Mears, a resident on the east coast of Lake Michigan since 1838, states that in that year he built a sawmill on White lake, and manufactured lumber there for 20 years; that he has had experience in improving harbors on this shore at six different points; has been a careful observer of the action and effects of the winds and currents at White lake and other points. He gives it as his judgment that the effect of opening the new channel will not be as stated in the bill of complainants and in Col. Webster's affidavit. On the contrary, that if the improvement is made, it is his opinion the present outlet will not be filled by drifting sands or by the action of the water. He further states that strong westerly winds raise the water in White lake 12 inches or more, and the result will be, if the new channel is made, that as the wind subsides and the water of Lake Michigan recedes, the pent-up waters of White lake will seek both outlets into the outer lake, not through the new channel alone, and will keep the present channel from filling with drifting sand. Such are the facts, and such the conflicting opinions presented upon this motion, from which to determine whether the complainants will be irreparably injured by the new channel when constructed.

It is clear that it will not be the new channel which will cause the old outlet to fill with sand, but the wind blowing the sand into this channel that will close it if it should be closed. The current in this outlet cannot be greater than that of the river above, which is two or three miles per hour—it is probably less, but if as great, a current running but two or three miles an hour would produce little or no effect in removing sand precipitated into the bed of the outlet; hence it is that great expense is necessary annually to remove the deposited sand. The only current that removes sand from the outlet is that which flows at irregular intervals, caused by water from Lake Michigan, blown into White lake on account of strong westerly winds, running out when the wind subsides; but this current is not adequate to remove the sand from the channel, and must be aided by the artificial means which are employed.

It appears, then, that this outlet would cease to be navigable to its present extent were it not for the use of such artificial means. And, as I view the facts, it does not appear but that, after the new channel is made, the same application of artificial means will keep this outlet open for all practical uses which complainants now enjoy therein. That use is principally in running logs, as vessels now receive complainants' lumber near the mouth of the outlet, and not at their mil, the lumber being conveyed by land carriage to a dock near Lake Michigan.

Complainants have a tug which they employ in this outlet, but it does not appear, from the facts of the case, but that the employment of artificial means in keeping the channel clear, to the extent now employed, would continue the present facilities for tug navigation, as well as other purposes, for which complainants now use the channel; unless the effect of the new channel will·be, not only to take a portion of the water accustomed to flow through the old, but lower the level of White lake to such an extent as to materially reduce the depth of water in the present outlet. It is said by the bill that White lake will, in consequence of the new channel being very much wider, deeper, and shorter than the old one, naturally and necessarily seek the level of Lake Michigan. This conclusion may be conceded; but what effect will thereby be produced in the present channel? The bill gives no information from which to answer satisfactorily the question. How much above the level of Lake Michigan is White lake? Is there any considerable difference, or such difference in the level of the two lakes as that the new channel will so far lower White lake as to prevent its water flowing into the old outlet, or materially reduce the depth of water therein? These questions I am unable to answer from the facts of the case, and do not feel disposed to interfere with the public work at White lake, designed, as it is, greatly to benefit commerce and navigation by affording what does not now exist, a safe and commodious entrance to one of the best harbors on the lake, except

the showing is such as decisively to require it. It will be conceded that the present channel, in its natural condition, is not so far navigable as that vessels of ordinary draught of water navigating Lake Michigan can enter through it into White lake, and that it is only kept or made navigable for crafts of light draught when artificial means are employed at great cost annually in dredging out the sand which is therein deposited by the frequently recurring strong westerly winds; and that the new channel will afford ample facilities for all classes of vessels to enter the harbor of White lake. It is, therefore, of great public importance that the cut be made.

If complainants can reach vessels in White lake, which enter through the new channel, to transport their lumber to market, without much greater inconvenience than they now do vessels at the mouth of the outlet, they would not seem, in this particular, to be materially injured by the new cut. Their mill cannot be materially different from midway between White lake and the mouth of the outlet. If sufficient water is left in the outlet, with or without the employment of the artificial means, for floating their logs to their mill, I cannot see wherein they are to be irreparably damaged. The result of the new channel may be to give complainants some inconvenience; more time may be consumed in running their logs if the current of the present outlet is diminished, as it probably would be; but mere inconvenience, or delay in navigating a stream, must be submitted to from motives of public policy where the public good demands it.

The right to interfere by injunction rests on the principle of a clear and certain right to the enjoyment of the subject in question, and an injurious interruption of that right, which, on just and equitable grounds, ought to be prevented. A court should be extremely cautious in the exercise of this power, and before enjoining an important public work, require a clear case on the facts as well as on the law. The injury should be apparent, and in a case like the present, of apprehended injury, resting largely in opinions on one side, and denials of injury on the other, the question of damage should be put beyond mere probabilities, and reach something like demonstration. My investigations have led me to the conclusion that complainants' right to the enjoyment of the water of White river outlet, as riparian owners, and as well in right of the public easement, to the extent which they now enjoy its use, is at law clear; but that the facts do not make a clear showing of necessity for the exercise of the restraining power of the court by injunction to protect them in the enjoyment of their rights. The motion for a temporary injunction is denied.

[NOTE. Concerning the right to an injunction against the government of the United States, an interesting case occurred in the circuit court for the district of middle Tennessee. The United States had obtained a judgment against an individual, and by various executions more was recovered than was due on the judgment, whereupon the court decreed a perpetual injunction against the United States, and that it should pay the costs. The supreme court, however, reversed this decree, holding, per Mr. Justice McLean, that "there was no jurisdiction of this case in the circuit court, as the government is not liable to be sued, except with its own consent, given by law. Nor can a decree or judgment be entered against the government for costs. The circuit court, as a court of law, may direct credits to be given on the judgment, consequently may examine the grounds on which such an entry is claimed, and may direct the execution to be stayed until such an investigation shall be made." U. S. v. McLemore, 4 How. (45 U. S.) 286. A bill in equity will not lie to enjoin the United States, —Hill v. U. S., 9 How. (50 U. S.) 386; nor can the president be restrained from carrying into effect an act which is alleged to be unconstitutional. A bill having that for its purpose cannot be filed. Mississippi v. Johnson, 4 Wall. (71 U. S.) 475. In a later case the following from Mr. Justice Gray, of the supreme court of Massachusetts, was quoted: "The broader reason is that it would be inconsistent with the very idea of supreme executive power, and would endanger the performance of the public duties of the sovereign, to subject him to repeated suits, as a matter of right, at the will of any citizen, and to submit to the judicial tribunals the control and disposition of his public property, his instruments and means of carrying on his government in war and in peace, and the money in his treasury." Briggs v. The Light Boats, 11 Allen, 162. Continuing, Mr. Justice Miller, speaking for the supreme court of the United States, said: "As we have no person in this government who exercises supreme executive power, or performs the public duties of a sovereign, it is difficult to see on what solid foundation of principle the exemption of liability from suit rests. It seems most probable that it has been adopted in our courts, as a part of the general doctrine of publicists, that the supreme power in every state, wherever it may reside, shall not be compelled, by process of courts of its own creation, to defend itself from assaults in those courts." In summarizing the law of the case Mr. Justice Miller also said: "This exemption is limited to suits against the United States directly and by name, and cannot be successfully pleaded in favor of officers and agents of the United States, when sued by private persons for property in their possession as such officers and agents. In such cases a court of competent jurisdiction over the parties before it may inquire into the lawfulness of the possession of the United States as held by such officers or agents, and give judgment according to the result of that inquiry. The difference in the essential features of a monarchical and republican form of government renders the decisions of the English courts on this subject of but little value as precedents, while an examination of numerous decisions of this court, from its organization under the constitution to the present day, establishes the foregoing proposition." U. S. v. Lee, 106 U. S. 196, 1 Sup. Ct. 240.]